Next case is Tyson v. Workers' Compensation Comm'n. 411-0541. Counsel, please. Good morning. May it please the Court? Mr. Hexel, my name is Ed Pryl. I represent the appellate, Mr. Tyson. Strenuous, awkward, demanding physically are the terms that the Commission used to identify this individual's work as a pressman for the State General Register since 1972. They go on, however, to say it just wasn't repetitive enough to be a work-related accident. Those are pretty strong words. You'll find those words in the actual decision of the Commission itself. Petitioner testified that over that period of time, as a pressman, the single work responsibility that he had that was most problematic for him was his duties as a maintenance operator for this very large press machine. He had to crawl into small spaces. In fact, he testified that he would have to crawl into spaces about the size of this desk standing behind me. He had to climb. The press itself was three stories high. He was going up and down this press throughout his work day. He's got to go up and down ladders. He's got to squat, and he's got to bend. These were all things that he testified to. The Commission, although acknowledging the strenuousness, the awkwardness, and the physically demanding nature of his job, says he wasn't doing it enough. What I think the Commission overlooked was the time distinction. He'd been doing this since 1972. He testified, which was not disputed at the time of trial, that starting in 2005, 75% of his work shifts he would spend doing them on the day shift. Did Dr. Miller help you? I think Dr. Miller helped me, Your Honor. And if I may, I'll get to the causation issue in a moment. Well, let's get back to your original point. I don't know that the Commission disputed that your client was doing everything he was supposed to do on his shift. The issue is whether or not it's sufficiently repetitive. You've got a videotape that shows he's doing everything you're saying. Kneeling, squatting, pushing, pulling, all sorts of movements. The videotape, however, if it's accurate, says he's doing these things, but for one or two minutes. How does it establish, if there's only an amount of time, where is the repetitive nature of a specific activity? Well, the repetitive nature is the fact that he's doing all of these activities. And if you look at the petitioner's testimony, and the Commission decision actually identifies this, I just think they overlook it. The petitioner testified that these were constant activities. He was constantly doing one or the other. One of my points to your Honorable Court is that he testifies that he wasn't on an assembly line. That's true. But I don't think you have to have facts of assembly line work to be able to establish repetitive trauma or chain of event stresses on the body. And we have all of these activities. The videotape is 17 minutes long. My review and recollection of that videotape is that it's showing these workers, and remember this is during the day shift, they're doing these activities the entire 17 minutes. That's just a synopsis of an individual's eight-hour workday. And that's where I was going to my point about the distinction between night shift versus day shift work. Everyone admits, including respondents on witness, that night shift work was a little less strenuous than day shift work. There were some pre-existing conditions and surgeries. What theory did you proceed on before the arbitrator? An aggravation of a pre-existing condition? A specific incident theory? What did you proceed on? Well, this is a repetitive trauma claim. It is an aggravation of a pre-existing condition. I don't think there's any dispute about that. There is medical evidence that establishes he did have problems to his hips and to his knees before. It is our position that those problems, although medically documented, did not result in any significant medical care. He never missed any time off of work as a result of that. In fact, the only time that he missed work was for an unrelated surgery that had nothing to do with this particular cause. So the theory was repetitive trauma at the very least aggravated a pre-existing condition, which would provide recovery because it doesn't have to be the sole or the only cause. It could be an aggravating cause. Getting back to Justice McCullough's question though, it seemed to me Miller's testimony was that the work activities did not cause or aggravate the claimant's underlying condition. Isn't that what Miller said? Well, I believe it depends on how you look at Dr. Miller's testimony. This is where the distinction I think has to be drawn. Dr. Miller testifies that symptoms can be caused and aggravated by the type of work that Mr. Tyson did for the employer. And he testifies to that on direct examination as the Section 12 examiner for the employer in this case. I then go back on cross-examination and ask him again. I just want to be sure I'm clear that it's your testimony that these work activities can cause and aggravate symptoms. He says, yes, they can cause and aggravate symptoms. The basic purpose for which an individual such as Mr. Tyson, or anyone for that matter, seeks medical care, seeks surgery for which he had done, goes to a doctor is because of symptoms. It is well settled, and I'm sure all of you have come across situations where you've been presented with evidence or testimony that establishes a person has a pre-existing condition but can never have a symptom associated with it. They can have underlying degenerative disc disease. They can have underlying problems with their hip that might show up on an MRI. It might show up on an x-ray, but never have a symptom. It's the symptom that's being treated in this particular case. And to answer Justice McCullough's question, Dr. Miller, in my opinion, provides the causation opinion. The reason why I believe the Commission and their decision is against the manifest way of the evidence and the fact that there can be an opposite conclusion drawn is the fact that the Commission decision is void of Miller's testimony. Never talks about it. Never says, oh, by the way, we find Adair not so credible based upon the hypothetical statement. However, they never say there was also another doctor, employer's Section 12 doctor, that says, I think these symptoms were aggravated or can be aggravated by the work that he did. All right. If you discount Miller's testimony, can you call our attention to find the record, was there any medical testimony that established the causal connection between the work and the disability? Was there medical testimony? What medical testimony was there? It's our position that it was Dr. Adair that provided that testimony. Which they discounted. I'm sorry? Which they discounted. The Commission. Went with Miller over Adair. Right. I think they, well, I don't know that they, because they don't mention it, I don't know that they really went with Miller over Adair or vice versa. They don't say Dr. Miller's name according to my review of the decision. They don't mention what he testified to. So I think you have these two doctors and, you know, we have a situation here where we have a pre-existing condition. There's no doubt about it. I will admit that the petitioner did not do a great job of going into his doctor and saying, this is what I do for a living. This is where my problem came from. And because of that, I think that's where the Commission comes to the conclusion and says, well, we just can't reach that far. But I think if you look at all of the evidence in this particular case. They discounted Adair's testimony because the job description given to him as a hypothetical did not match his testimony, and it didn't. Well, I disagree, Your Honor, that it didn't. I will, I will. Dr. Adair, and I wrote these particular issues down thinking this was going to be discussed this morning. Dr. Adair was given a hypothetical regarding continuous climbing up and down ladders. He was given a hypothetical regarding continuous in and around structures. He was given a hypothetical regarding stepping up and down gaps. And he was up and down on his knees. And then there was a hypothetical with regards to pushing these large rollers of paper. In my brief, and what I propose to you today, the only distinction between Dr. Adair's information given to him and petitioner's testimony is the specific number of times that he pushes this roller. There was a significant discrepancy. There was a discrepancy with regards to that, and I will concede that. However, when you look at all of the other things that this gentleman did for this employee, he climbs up and down ladders. He gets in and around structures. There was no dispute when he testified that he's got to crawl into a space the size of that desk to do his job as a maintenance worker. He's got to step up and down gaps. The video shows all of this, shows these activities, and this video was offered by the respondent in this particular case. So I disagree with the commission's decision that Dr. Adair did have the necessary information for him to draw a conclusion and opine. And what I think he did is he was very careful with how he shaped his causation opinion. He uses the terms microtraumas, and he uses those terms, I think, very similarly to Miller with respect to the fact that you look at what he's doing at work. It's these microtraumas of these activities that's aggravating the problem. I don't think you're going to get any doctor to opine that the work in this particular case caused his problem. You're going to get opinions, which you have been presented with, of opinions saying that this work aggravated his symptoms, caused his problems. And if you look at the timing for which his problems became most significant in 2007, what were his problems? Let's parse this out. What were his problems? Well, the condition that was operated on was his hip. One surgery was done. Dr. Adair testified he would have to have a second surgery done in the future. Part of the original arbitration award granted Petitioner a future medical with respect to that. There were also issues with his knees. So I think really the two major body parts that we're addressing here are the hip and the knees. Okay. But his problem is a condition that was diagnosed as degenerative arthritis. Oh, you're correct, Your Honor. Yes. Okay. That's his problem. That is correct. So what is the evidence that that, by aggravation of his condition, degenerative arthritis, aggravation must mean that it does something to the degenerative disease. Arguably, it presumably hastens it, makes it worse. And the only way it could make it worse would be make it more extensive or make the degeneration move on a faster plane. I understand, Your Honor. Where is that evidence? Well, I think Dr. Adair addresses that issue. If you look at the testimony, and also Dr. Miller addresses this issue as well, with respect to if we take two individuals, if we take Mr. Tyson and we clone him and we put him in two different positions, two different jobs. One is his job as pressman, maintenance man for the state general register. Another one as a clerical worker who sits all day and does nothing. Dr. Adair testifies that the second person may never have any problems. He's going to have the same underlying degenerative problems. But because of the nature of his work, or lack thereof, he may never have any problems. Again, we're into that. We're not very precise in our language. They both have problems called degenerative arthritis. The point is, you're saying a clerical worker may not have to have surgery at all or may only require surgery some years later than the other. That's what you have to establish. The argument is that the work aggravates, and I'm not sure, Your Honor, that... Because when you're talking about symptoms, I mean, are we saying recovery symptoms get recovery? I mean, it's kind of like going to the doctor and saying it hurts when I hit my head against the wall. Don't put your head against the wall. Except for the distinction that this individual goes back and does this work day after day after day. Let me ask you a question. Assuming that there's no evidence in the record that his work caused the condition or contributed to the condition, there certainly is evidence in the record that they increase the symptom if we call pain a symptom. So my question is, if a person has an increase in symptoms in a non-work-related physical condition and that symptom interferes with his ability to work, is it compensable under the act? I believe it is, Your Honor. But is the medical treatment to correct the underlying condition compensable? I think it is. Why? If you use the old but-for argument. But-for, the work that the person is doing that increases the symptoms, which occurs in the workplace, and you get into the whole discussion, you go back to Workman's Comp 101, increased risk, you know, those types of things, you have but-for his work, his symptoms become worse. Now if he goes to work one day, has symptoms, I agree with Justice Holdredge, he may never have a compensable Workman's Comp case. So we have an individual that goes back year after year, day after day, of doing this work where symptoms continue to be aggravated. Symptoms or pain, is there a difference? I'm trying to put a fine point in it, maybe too fine a point, but isn't there a difference between something that triggers a pain, and then aggravates the condition? I think there could be a distinction to that. And I think you would probably depend upon the nature of the underlying condition, whether you're talking about a spine versus a knee, and I'm certainly not a doctor, I have to rely upon these individuals to help me, you know, understand these things, but it's his work that causes this problem. It's the work that causes his need for medical care. It's the work... Wait, wait, wait. His condition caused his need for an operation. It was the work that caused the symptom. If you eliminate the work, you eliminate the symptom, the cause is still there, unchanged. So we get back to the situation. What are his rights under the Act? Does he get CTD? Does he get maintenance? But is he entitled to medical treatment to eliminate a condition that is not work-related? Well, counsel, you have not been answered that on the rebuttal. I'm going to ask why you're sitting down. All right, thank you. Counsel, please. Good morning. May it please the Court, Mr. Terrell. I'm Martin Haxel. I'm the attorney for the employee of the State Journal Register. As we all know, the Commission found in my favor, they concluded that the petitioner's job duties were not repetitive in nature and that his pre-existing arthritis was so far advanced that it was going to happen to him anyway. You know what the issue is we're discussing. He's hanging in there on the aggravation of a pre-existing condition theory. So tell us why that's not a viable argument. Well, in the absence of trauma, he still got to prove under the facts of this particular case that his job duties were repetitive. If you don't have trauma, I mean, you know, it's true the Commission doesn't even mention Dr. Miller's testimony. They came to the conclusion that no evidence of repetitive job activity in Dr. Adair's causal connection opinion is flawed. He failed to prove his case. But if you look at Dr. Miller's testimony, he says there's a number of things that can cause degenerative arthritis. And in this particular instance... I don't think there's any question. This man's job didn't cause degenerative arthritis. No. That's not even on the table. The question becomes, Miller draws a distinction between an activity which causes pain and the activity which accelerates a condition. My question was, if what the man's work causes pain as a result of a condition that is not work-related, is he entitled to compensation under the Act? Just for the simple... Under the facts of this case, especially, I would say no, Your Honor, because you still got to make the distinction between, is this something that is caused by a trauma which occurs at work or some other work-related risk, versus is this the normal aging process? And the testimony and the evidence in this case, I think overwhelmingly shows it is part of the normal aging process. Okay. The normal aging process, or the normal degenerative process, you'd have to say causes pain. Yes. Okay. So that, in effect, he'll have pain, whether he hits his head against the wall or not. You can have more pain when you hit your head against the wall, but yes, you can still have pain. Okay. Because that's kind of the point we're at. You're saying there's a level of pain with this condition, but when he's at work, there's a higher level of pain. Well, I think... So is that higher level of pain compensable under the Act? By the time this petitioner sees his surgeon, Dr. Adair, in the summer of 2007, when he first sees Dr. Adair, he says, I've had these symptoms of hip and knee pain for 10 years. Okay. Doesn't say a word about his job, but he says, I've had this pain for 10 years. Then you look at the medical records of this petitioner's regular physician, the guy he's been going to for his normal medical treatment for years and years. That's Dr. Lanzati. He first sees Dr. Lanzati for the same symptoms seven years earlier, in the year 2000, where he is diagnosed with left hip pain. He sees Dr. Lanzati again in, I think, 2003. He's working for the State Journal-Register all this time? Yes. For 35 years? Yes. I mean, even with the lesser job description, it's not hard to see how doing that kind of work day in and day out could break down your body, is it? You've got to distinguish job duties between when the presses are running and when they're not. Okay? What he did for 30 plus years was come in at midnight or 11 o'clock in the evening and run the presses. And his testimony was, you know, we had about an hour and a half of work to get everything lined up. Once the presses started running, I'd work for 20 minutes and I'd go sit down for 20 minutes. And after six and a half hours, my shift was done, and I went home. Now, in 2005, he spends most, but not all of his time, working days. They are doing more maintenance work during the day, but they are still running the presses during the day. He doesn't do a good job of establishing how much time he spends doing any particular activity. But if you look at his testimony carefully, what he's trying to say is, they're either getting the press ready, they're running the press, or they're performing the maintenance on the press, and you're always doing one of those things. But when you're running the press, things are pretty easy. And when you're not running the press and you're performing these maintenance activities, what do they consist of? The evidence shows a variety of different tasks shared by a number of coworkers performed in a variety of positions using a variety of tools. And that is simply not the definition of a repetitive job task performed on a daily basis, which is what the petitioner has to prove. He hasn't done it. Well, it occurs to me that there isn't a lot of difference between a portion of Adair's opinion and what Miller had to say. Adair says that this man's job activities can render his condition symptomatic. And Miller testifies that he concedes that the activities required in a plaintiff's job would certainly be painful for someone with an arthritic joint. So we're back to the same question. Is the symptom alone, if it's caused by the work, as opposed to any causal connection between the underlying condition compensable under the act? I think we've got to go back to had his underlying condition reached the point where any exertion is an overexertion. I would suggest to the court yes, it had. What I think Dr. Miller testifies to is by the time he sees this man, which I think was in 2008, everything he did caused him pain. Everything. When Dr. Adair's deposition was taken on cross-examination, he was asked about the degree of osteoarthritis, and he said that this petitioner, with his advanced stage of osteoarthritis, he can have pain at any time of the day or night, regardless of whether he's at work, at home, someplace else. That's in the record, page 143, 144. And so you've got a situation here where this poor guy, probably due to his genes, his genetic makeup, he's just got a ton of arthritis in his hips and his knees, and everything he does is causing him pain, which is precisely what he told his family doctor years before this work issue ever arose. He told his Dr. Lanzati four years before he ever sees Dr. Adair. Any kind of movement, bending, stooping, going upstairs, causes a lot of pain. And he says the same thing in 2006, and then the symptoms continue when he sees Dr. Adair in 2007 and Dr. Miller in 2008. So what you've got here is a guy with a genetic predisposition to having serious degenerative arthritis. By the time he reaches 2003 and 2004 and beyond, it is so far advanced the poor guy is in pain all the time. Any movement, any activity causes him problems. And as a result, the commission correctly determined, one, no proof of repetitive job activity, and two, Dr. Adair's causal connection opinion is not reliable because the hypothetical is simply not proven by the remainder of the evidence. So, we all know petitioners have got to convince the five of you that the commission's decision was contrary to the manifest weight of the evidence. I would submit he can't do that. I would submit that is such a high hurdle for him to overcome that you can't look at this body of evidence as a whole and come to the conclusion that an opposite decision is clearly apparent. Justice Hoffman, I've had a chance to think about your question proposing the conclusion. We have to look beyond the symptom and we have to look at what the doctor says in relation to that symptom, which is in any particular case, whether you've got a petitioner or an employee who has a broken arm, that broken arm may result in excruciating pain, but the person could still continue to work because they could use their non-broken arm, so they would not be entitled to TTE benefits. In this particular case, you have a petitioner who was instructed by his doctor because of those symptoms not to work, and as a result of that, he would be entitled to TTE benefits pursuant to the workers' compensation statute. With regards to the medical care issue, the symptom is what is treated. We've all agreed the underlying degenerative problem this individual has, although not caused by work, as Mr. Haxel said, probably a situation of bad genes, it's his symptoms that each of these doctors say work can cause these symptoms, cause the pain. If the gentleman never works again, then maybe his symptoms go away. He continues to work when the symptoms become really bad in 2007, 2005, 2007, and it's those symptoms for which the recommendation for surgery is made. I can't think of any doctor, orthopedic or not, that would recommend surgery for a patient who was asymptomatic. So I think the answer to the question is that yes, if the symptoms are aggravated by work, if the doctor says no work because of that symptom, the statute says temporary disability benefits shall be applied. Likewise, with regards to medical care, if the symptom is being treated in whatever form, conservative, surgical, however it might be, because that symptom stems from work and the work that he's doing, he's entitled to compensation. But Miller testifies that his need for medical treatment for his knees and hips was due entirely to a natural progression of his underlying osteoarthritis and not his work activities. So we've got a situation here where pain may have been caused by work, but the underlying condition was not, and he wants medical expenses for the treatment of the underlying condition. So there's no causative connection. Well, you can establish that the need of that medical treatment is accelerated by his work activities. He could have gone years, I think Mr. Tyson at the time of his arbitration was about 57 years old if my memory serves me correct, he could have gone years without the need of that surgery, but for the fact that his work   accelerated by his work, I don't want to misstate to the court that that was brought up in both Adair and Miller, and I'd have to go back and reexamine the transcripts. Thank you.